COASTAL STATES GAS PRODUCING COMPANY et al., Appellants,

v.

LOWER COLORADO RIVER AUTHORITY, Appellee.

No. 4904.

Court of Civil Appeals of Texas, Eastland.

Nov. 24, 1976.

Supplemental Opinion Dec. 23, 1976.

Tracy N. Dubose, Houston; William R. Vance, Bryan, for Coastal States.

Jefferson D. Giller, M. W. Parse, Jr., Russell H. McMains, Robert B. Dillon and Daniel K. Hedges, Fulbright & Jaworski, Houston, John M. Lawrence III, Lawrence, Thornton, Payne & Watson, Bryan, Joseph Jaworski, John H. Buck, Bracewell & Patterson, Houston, for Lo-Vaca.

William T. Moore, Bryan, Mac Umstattd, Hume Cofer, Austin, James C. Winters, Michael J. Wood, David L. Griffis, David Kocian, Winters Deaton, James & Briggs, Houston, for appellee.

WALTER, Justice.

Lower Colorado River Authority recovered a judgment against Coastal States Gas Producing Company for $25,218,060.67 for breach of contract. Coastal and intervenor, Lo-Vaca Gathering Company, have appealed. We reverse and render.

LCRA entered into a contract in 1962 with Coastal to purchase all the natural gas required to fuel its electric generating units until January 1, 1985, at fixed unit prices. The contract provided it could not be assigned without the written consent of the other party. On October 21, 1963, Coastal assigned the contract to Lo-Vaca without the consent of LCRA. In 1972, the parties amended the contract. LCRA was constructing a generating unit at its Granite Shoals Plant and was desirous of having gas delivered to that plant. The amended contract provided in part:

> "WHEREAS, Coastal States Gas Producing Company, by and through its wholly owned subsidiary Lo-Vaca Gathering Co., a Delaware corporation (hereinafter called COASTAL), with performance by such subsidiary being guaranteed by Coastal States Gas Producing Company, is willing to do or cause to be done the things desired by LCRA under the terms and conditions set out herein;
> . . . ."

> "This agreement and its relationship to the CONTRACT is entire, and it is not intended that the obligations and rights thereunder or hereunder be in any way severable. The CONTRACT shall be deemed to be and is hereby amended and supplemented only to the extent necessary to give effect to the specific provisions hereof, but not otherwise."

This amended contract was executed by Coastal, Lo-Vaca and LCRA.

The Railroad Commission on January 5, 1973, issued its statewide order setting priorities on gas for all gas utilities. In the order, all gas utilities were directed to file a curtailment plan. In February, 1973, Lo-Vaca filed its plan which provided for a higher priority to electric generating customers than the statewide order. LCRA supported Lo-Vaca's curtailment plan before the Commission. It filed a motion with the Commission requesting that Lo-Vaca's curtailment program be made effective immediately on an interim basis. LCRA asserted in this motion:

"The status of the customers receiving gas from the Lo-Vaca system is best known to Lo-Vaca since it possesses the most information as to the whole group and is best acquainted with their needs; consequently, the Order of Priority presented by Lo-Vaca should have been conceived on the basis of the relative needs for and uses of gas of its various customers and should be reasonable and fair to all concerned. This Order of Priority places electric generating entities such as LCRA in Priority A(3) which is substantially higher than its priority under the statewide order."

Thereafter, Lo-Vaca filed an amended application under Articles 6053 and 6054 of the Revised Civil Statutes of Texas for a review and revision of prices and rates under existing agreements for the sale of gas to its customers. LCRA filed a motion to be dismissed from this proceeding, asserting its contract was with Coastal and it did not consent to the assignment. Coastal was permitted to intervene and became a co-applicant with Lo-Vaca.

LCRA says:

"Since LCRA was involuntarily dependent upon a gas pipeline system that was fast running out of gas, LCRA, along with other parties to Docket 500, suggested to the Commission that Lo-Vaca be granted an interim rate so that it could maintain its gas supply until the Commis-

sion could make a final decision in the proceeding . . ."

In the matter of Lo-Vaca's application to review and revise existing contracts, LCRA delivered to the Commission its suggested emergency rate order in part as follows:

"(1) That LO-VACA and COASTAL STATES have been and are jointly engaged in the operation of a natural gas utility with LO-VACA servicing sales contracts upon which COASTAL STATES is obligated and being furnished financing for its operations by COASTAL STATES;

(2) That the Commission has jurisdiction over COASTAL STATES and LO-VACA for all purposes of this order;

(3) That the public interest requires that the gas supply of LO-VACA be increased with all possible dispatch in order that sufficient gas supplies be available to meet the needs of the consumers of gas and electricity who are depending upon the LO-VACA system and that because of LO-VACA's presently deficient gas supply a public emergency exists;

(4) That LO-VACA's gas supply position cannot be satisfactorily improved in the absence of an emergency rate in excess of that now collectible under existing customer contracts. Such a rate must yield sufficient revenue to cover LO-VACA's cost of operations and the cost of purchased gas resold through the LO-VACA system; . . ."

The Commission rendered its interlocutory order on September 27, 1973, in part as follows:

"IT IS THEREFORE ORDERED By the Railroad Commission of Texas that, pending final decision in the combined rate and curtailment applications of Lo-Vaca and Coastal States in Gas Utilities Docket Nos. 500 and 505, as well as related proceedings, the rules of practice and procedure of the Gas Utilities Division are hereby suspended, pursuant to Rule 58 thereof; and

IT IS FURTHER ORDERED That, pending a final decision in the combined rate and curtailment proceedings present-

ly underway, an interim rate is hereby granted and shall be applicable to all customers of Lo-Vaca now paying a lower rate, providing that no such customer shall be required to make any increased payments except upon the following conditions concerning such rates and refunds:

1. All revenues collected by Lo-Vaca in excess of existing contract prices or rates shall be subject to refund upon review by the Commission or in the event final determination in Docket No. 500 establishes lower rates in the public interest, or this proceeding is otherwise terminated;

2. Customers with contract prices or rates below the interim rate shall be entitled to reject this interim rate in its entirety within ten (10) days of the effective date of this order; and any failure to timely file such rejection with the Railroad Commission shall be tantamount to an agreement and approval thereof; and any customers filing a rejection shall not be allocated pursuant to the curtailment program adopted in Docket No. 508, any gas supply or deliverability added to the Lo-Vaca system after the effective date of this order;

3. Customers accepting the interim rate and customers at rates higher than the interim rate shall share in the allocation of additional gas volumes in accordance with the Commission's curtailment order affecting Lo-Vaca;

4. Applicants herein shall refund all increased amounts, including statutory interest, that are not finally determined to be in the public interest. Customers now paying a higher price for gas shall not be affected by this interlocutory order, except that any excess amounts paid by such customers during the time this interim rate is in effect over the final rate established by the Commission in the public interest, shall be subject to refund or reimbursement by Lo-Vaca.

The interim rate shall include a cost of gas, or commodity, element which will be the weighted average cost of gas to Lo-Vaca as of June, 1973, indicated by Lo-Vaca's evidence to be 24.55¢/MCF. This cost of gas shall be adjusted each month after June, 1973, and the average cost of gas for the calendar month ended two months prior to the first day of the billing month.

The interim rate shall also include a factor relating to fixed and variable costs that is intended to allow Lo-Vaca to recoup its costs, excluding the cost of purchased gas, and is not designed to afford Lo-Vaca a rate of return on its investment. This portion of the rate is hereby fixed at 5¢ per MCF of delivered gas to be applied in all monthly billings to customers as a flat rate charge.

IT IS FURTHER ORDERED That nothing contained herein is intended to affect the rights and obligations of the parties to this proceeding as between themselves or otherwise, *except to the extent of affecting rates during the effective period of this interim rate.*

IT IS FURTHER ORDERED That the revenue generated by this interim rate shall be used for the sole purpose of increasing the gas supply and delivery capability of the Lo-Vaca system, and that no funds shall be paid to Coastal States Gas Producing Company, or any other company in the Coastal States family, for any purpose other than acquiring gas supplies, and any monies paid by Lo-Vaca to any of the Coastal States family of companies, or agreements made between Lo-Vaca and any such companies, shall be subject to Commission review and approval.

IT IS FURTHER ORDERED That Coastal States Gas ˙Producing Company and Coastal States Gas Corporation shall make contributions to the capital of Lo-Vaca Gathering Company in an amount up to $2,500,000 per month, cumulatively during the term of this Order, upon demand or request of the supervisor-manager of Lo-Vaca Gathering Company, for use by the management of Lo-Vaca in making necessary pipeline and gathering line extensions and natural gas treating facilities and for use as working capital for advance payments for purchase of new gas . . ." (Emphasis added)

On November 9, 1973, the Commission issued its letter order as follows:

"Honorable Charles Herring
General Manager
Lower Colorado River Authority
P.O. Box 220
Austin, Texas 78767
IN RE: Gas Utilities Docket No. 500,
Interlocutory Order of
September 27, 1973

Dear Mr. Herring:

The Commission has reviewed the application filed on November 5, 1973, by Lo-Vaca Gathering Company and Coastal States Gas Producing Company (applicants) regarding your letter of October 30, 1973, and the position the Lower Colorado River Authority (LCRA) is taking toward the captioned order.

The Interlocutory Order covered the applicants, Coastal States Gas Corporation, and all customers involved in Gas Utilities Docket No. 500, and was issued for the purpose of providing Lo-Vaca the financial ability to augment its natural gas supply in order to avert human hardship during the coming winter heating season. The Commission's Interlocutory Order was issued in the public interest, and contained a specific provision preserving the rights and obligations of the parties involved in the captioned rate case. Legal remedies are available for determining such rights and obligations and the courts provide the proper forum for such determinations.

The LCRA is subject to the Interlocutory Order issued September 27, 1973, and must pay Lo-Vaca the interim rate provided therein."

LCRA contends it has never challenged the interlocutory order or the interim rate. LCRA says all it seeks is a determination of whether Coastal is obligated contractually to reimburse it for the difference between the contract price and the interim rate. It says the interlocutory order did not alter the price provision of the LCRA–Coastal contract.

The letter order of the Commission states LCRA is covered by the interlocutory order and must pay Lo-Vaca the interim rate.

This order in direct terms refutes the contention there was no revision of the LCRA–Coastal contract.

After the Commission's letter order, LCRA delivered to Coastal the following letter:

"November 29, 1973
Mr. Harry G. Fair, President
Coastal States Gas Producing
Company
Five Greenway Plaza East
Houston, Texas 77046

Dear Mr. Fair:

I am enclosing two checks payable to Coastal States Gas Producing Company. These checks are in response to a statement sent us by your supplier, Lo-Vaca Gathering Company, but since our contract is with Coastal States Gas Producing Company we are making our payments to you under our contract.

The reference on the statement sent us by Lo-Vaca Gathering Company mentions that it is for gas furnished during the month of October 'under Contract No. 5207 dated 10–10–72' and, of course, we have no such contract but are assuming the statements for gas for the month of October cover the gas being furnished us by Lo-Vaca Gathering Company on your account under our contract with your company dated October 10, 1962.

Check No. 94005, dated November 27, 1973, is enclosed in the amount of $451,933.68 which, according to our calculations attached thereto, is the amount we owe under our contract of 1962.

I am also enclosing our Check No. 94004, dated November 27, 1973 in the amount of $209,137.60. This check is being sent under protest and only because of the letter order issued by the Railroad Commission on November 9, 1973. We do not consider that the Railroad Commission has the authority to change our contractual relationships with Coastal States Gas Producing Company; therefore, I would like it clearly understood that this particular check is being paid under protest and with no direct or indirect implication or admission that it is validly owed, and all rights of the Lower Colorado River Au-

thority existing under its contract with your company are specifically retained and reserved.

> Yours very truly,
> s/Charles Herring
> Charles Herring
> General Manager

H/w
Enclosures"

Each month thereafter LCRA paid the interim rate under protest.

■ In the case at bar, LCRA recovered the difference between the original contract price and rate fixed by the Commission. Appellants contend the court had no jurisdiction to entertain LCRA's suit for the difference between the contract price and the interim rate set by the Commission because it is an impermissible collateral attack upon the Commission's orders. We agree.

Coastal, the parent corporation of Lo-Vaca, and all subsidiaries of the holding company's system were deemed to be applicants before the Commission in Lo-Vaca's application for a review and revision of rates. The 1962 contract executed by LCRA to Coastal was assigned to Lo-Vaca without the consent of LCRA. However, as between Coastal and Lo-Vaca, the effectiveness of the assignment is not challenged and Lo-Vaca has supplied gas to LCRA under the contract from the beginning.

The interlocutory order recited ". . . An interim rate is hereby granted and shall be applicable to all customers of Lo-Vaca now paying a lower rate . . ." The Commission regarded LCRA as a customer of Lo-Vaca. As we will discuss later, we are of the opinion LCRA was estopped as a matter of law to deny it was a customer of Lo-Vaca. Prices, rates, rules, and regulations and conditions of service in contracts with a gas utility are subject to change by the Commission.

Art. 6054, Tex.Rev.Civ.Stat.Ann., provides:

"All orders and agreements of any company or corporation, or any person or persons controlling such pipe lines estab-lishing and prescribing prices, rates, rules and regulations and conditions of service, shall be subject to review, revision and regulation by the Commission on hearing after notice as provided for herein to the person, firm, corporation, partnership or joint stock association owning or controlling or operating the gas pipe line affected. Acts 1920, 36th Leg., 3rd C.S., p. 18, ch. 14, § 3."

In *Texarkana & Ft. S. Ry. Co. v. Houston Gas & Fuel Co.,* 121 Tex. 594, 51 S.W.2d 284 (1932), the court said:

"In construing statutes enacted directly by the Legislature it is the duty of the court to look to the entire act, including the caption, the body of the act, and even the emergency clause, to determine the legislative intent. When the legislative intent is once determined it is the law. *If such is the rule as applied to legislative acts, we think the same rule should apply to the rules and rate orders promulgated by our railroad commission.* In other words, when we come to interpret and construe the rules and rate orders of the commission it is the intent of the commission, fairly expressed in the rule or rate order, which should govern, and when such intent is once ascertained it should be given effect. *Furthermore as above stated, where the commission has officially interpreted its own rules and rate orders, such interpretation should be considered a part thereof. West Texas Compress Co. v. Railway Co.,* supra [Tex.Civ. App., 7 S.W.2d 597]." (Emphasis added)

The Commission, acting in the public interest, has revised the contract and increased the price to be paid by customers of the utility. When these contracts were executed, the parties were charged with knowledge the Commission could override contract prices and decrease or increase prices.

In *Gillies v. La Mesa Lemon Grove and Spring Valley Irr. Dist.,* 54 Cal.App.2d 756, 129 P.2d 941 (1942) the court said:

"The action for damages was based on a violation of the terms of the Flume Company contract which had been super-

seded by the rates established by the commission. As the rates established in the contract cannot be enforced between the parties it follows that violation of the terms of that contract can furnish no ground for an action for damages."

In 73 C.J.S. Public Utilities § 16, it is said:

"Inasmuch as the sovereign power of the state to fix rates for the product or service of a public utility cannot be defeated or taken away by contract, as discussed supra subdivision a of this section, any such contract relating to rates must yield to the regulatory powers of the state unless excepted therefrom by constitutional or statutory provisions; and an unexpired contract does not authorize or compel a utility to charge a different rate from that provided by effective schedules established by the state. Every such contract is conclusively deemed to be made with knowledge and in contemplation of the sovereign power of the state to alter it, . . ."

In *Crawford v. McDonald,* 88 Tex. 626, 33 S.W. 325 (1895), the court said:

"A direct attack on a judgment is an attempt to amend, correct, reform, vacate, or enjoin the execution of same, in a proceeding instituted for that purpose, such as a motion for a rehearing, an appeal, some form of writ of error, a bill of review, an injunction to restrain its execution, etc.

A collateral attack on a judgment is an attempt to avoid its binding force in a proceeding not instituted for one of the purposes aforesaid, as where, in an action of debt on a judgment, defendant attempts to deny the fact of indebtedness; or where, in a suit to try the title to property, a judgment is offered as a link in the chain of title, and the adverse party attempts to avoid its effect, etc."

Article 6059, Tex.Rev.Civ.Stat.Ann., provides, in part, as follows:

"If any gas utility or other party at interest be dissatisfied with the decision of any rate, classification, rule, charge, order, act or regulation adopted by the Commission, such dissatisfied utility or party may file a petition setting forth the particular cause of objection thereto in a court of competent jurisdiction in Travis County against the Commission as defendant . . ."

■ The general rule is announced by numerous cases that orders of the Commission within its delegated authority are immune from collateral attack unless they appear to be void on their face. *Lone Star Gas Co. v. State,* 137 Tex. 279, 153 S.W.2d 681 (1941); *Railroad Commission of Texas v. Royal Petroleum Corporation,* 93 S.W.2d 761 (Tex.Civ.App.—Amarillo 1936, writ dism'd).

We hold this suit constitutes an invalid collateral attack on the interlocutory orders. The Commission raised the price of gas delivered to LCRA and LCRA ignores those orders and seeks to recover for breach of the contract as it was written before the Commission reviewed and revised the rates. The terms of the contract relating to rates must yield to the Commission's orders.

■ LCRA voluntarily supported Lo-Vaca's proceedings before the Commission in its capacity as a customer of Lo-Vaca seeking a higher priority for electric generating entities than its priority under the statewide order. It has knowingly received gas from Lo-Vaca under the Commission's orders. It has taken the benefits of the orders as a customer of Lo-Vaca and cannot reject its obligations to pay for the gas under the interim rate established by the Commission. We sustain appellants' contention that as a matter of law LCRA cannot occupy the inconsistent position of being a Lo-Vaca customer for purposes of obtaining gas but not being a Lo-Vaca customer for purposes of payment for gas delivered under the interim rate.

In *Cincinnati Siemens-Lundgren Gas Illuminating Co. v. Western Siemens-Lundgren Co.,* 152 U.S. 200, 14 S.Ct. 523, 38 L.Ed. 411 (1894), the court said:

". . . The Chicago corporation afterwards transferred all its franchises and property, including its rights and interest

in this contract, to the plaintiff. The Ohio company carried on its correspondence, and sent its orders for goods to the gas illuminating company, and, though notified of the transfer to the plaintiff, declined, in its letters to recognize such transfer. At the same time it received the goods, and did not return them, and received them knowing that they were sent by the plaintiff. Upon this the defendant invokes the rule laid down in *Arkansas Valley Smelt. Co. v. Belden Min. Co.,* 127 U.S. 379, 8 S.Ct. 1308 [32 L.Ed. 246], and insists that the contract was of such a nature that it could not be assigned by the gas illuminating company to plaintiff without the consent of defendant, which consent was positively refused. But that doctrine has no application, under the circumstances of this case. Defendant could not accept these goods from the plaintiff, and then refuse to pay for them. It is immaterial whether there was an assignment from the gas illuminating company to the plaintiff or not, or whether, if there was one, it was ever assented to by the defendant or not. When the defendant ordered the goods from the gas illuminating company, and the plaintiff forwarded the goods upon that order, the defendant might have returned them, and declined to have any dealings with the plaintiff; but it could not accept the goods and use them, and then say it never ordered the goods from the plaintiff, never had any contract with it, and never assented to any assignment to the plaintiff of its contract with the illuminating company."

In 22 Tex.Jur.2d Estoppel § 11, it is stated in part:

"A person will not be permitted to accept the beneficial part of a transaction and repudiate the disadvantageous part. In other words, one who retains benefits under a transaction cannot avoid its obligations, and is estopped to take a position inconsistent therewith. Similarly, one cannot accept and reject the same instrument, or, having availed himself of the benefits conveyed by a part of an instru-

ment, reject its other provisions . . ."

In *Daniel v. Goesl,* 161 Tex. 490, 341 S.W.2d 892 (1960), it is said:

"Dr. Goesl having elected to retire and having demanded and accepted the benefits accruing to him as provided for in the agreement cannot accept that part of the contract beneficial to him and deny the application of other provisions of the contract which may be detrimental. *Doty v. Barnard,* 92 Tex. 104, 47 S.W. 712. To paraphrase what we said in *Guadalupe-Blanco River Authority v. City of San Antonio,* 145 Tex. 611, 200 S.W.2d 989, 997, Dr. Goesl seeks to retain the beneficial part of the transaction and to repudiate the disadvantageous part because of the alleged fraud of the other party. This he may not do."

The judgment is reversed and judgment is rendered that LCRA take nothing from Coastal.

## SUPPLEMENTAL OPINION

### PER CURIAM:

Coastal States Gas Producing Company and Lo-Vaca Gathering Company have filed a motion for modification of judgment. They assert:

". . . However, as a result of the trial court judgment's obscuring the fact that Coastal States Gas Producing Company was awarded its counterclaim of ONE MILLION FIVE HUNDRED TWENTY–THREE THOUSAND SIX HUNDRED FORTY–ONE DOLLARS ($1,523,641.00) as a credit offset, this Court apparently overlooked such award in the rendition of its judgment on appeal . . ."

The judgment provides in part as follows:

"It is therefore ordered, adjudged and decreed by the Court that the plaintiff, Lower Colorado River Authority, shall have and recover of and from the defendant, Coastal States Gas Producing Company, the sum of $25,218,060.67, which amount represents the aforesaid amount of $26,741,701.67 less an offset credit to

defendant of $1,523,641.00, together with interest on said amount of $25,218,060.67 from June 24, 1975 until paid, at the rate provided by applicable law."

We hold the pleadings and proof support the trial court's award of the offset credit to Coastal of One Million Five Hundred Twenty-Three Thousand Six Hundred Forty-One Dollars ($1,523,641.00) on its uncontested counterclaim.

It is therefore ordered that Lower Colorado River Authority take nothing from Coastal as we have heretofore held in our original opinion and judgment, and it is further ordered that Coastal States Gas Producing Company recover One Million Five Hundred Twenty-Three Thousand Six Hundred Forty-One Dollars ($1,523,641.00) from Lower Colorado River Authority plus interest from the date of said judgment, July 28, 1975, plus costs.